IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 08-10057-CR-MOORE

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

ONECHE GARCIA-CORDERO,

    Defendant.
_____/

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS COUNTS 37-71 OF THE INDICTMENT

THIS CAUSE came before the Court upon Defendant Oneche Garcia-Cordero's Motion to Dismiss Counts 37-71 of the Indictment (dkt # 37).[1]

UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

**I. BACKGROUND**

The Grand Jury's Indictment (dkt # 17), filed on August 22, 2008, charged Defendant Oneche Garcia-Cordero with conspiracy to encourage and induce aliens to enter the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Count 1); encouraging and inducing aliens

---

[1] Although co-defendant Junior Arce de la Cruz similarly filed a Motion to Dismiss Counts 37-71 (dkt # 33), he subsequently absconded while under pretrial release supervision. Due to his absence, Defendant Arce de la Cruz has been unable to stand trial, and his case has been transferred to the Clerk's Fugitive File (dkt # 62). As Defendants conceded in their Replies (dkt # 49), it would be premature to address their "as applied" challenge prior to the development of a factual record at trial. Since Defendant Arce de la Cruz's trial has not occurred and the factual record in that matter has not been developed, the Court concludes that it would be premature to rule on his Motion. Therefore, this Order addresses only Defendant Garcia-Cordero's Motion.

to enter the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv) (Counts 2-36); bringing aliens to a place other than a designated port of entry, in violation of 8 U.S.C. § 1324(a)(2)(B)(iii) (Counts 37-71); and attempting to reenter as a removed alien, in violation of 8 U.S.C. § 1326(a) (Count 72).

Prior to trial, Defendant filed a Motion to Dismiss Counts 37-71 (dkt # 37). The applicable statute for those counts, § 1324(a)(2)(B)(iii) ("the statute"), provides, in relevant part:

> (2) Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs--
> . . .
> (B) in the case of--
> . . .
> (iii) an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry,
>
> be fined under Title 18 and shall be imprisoned . . . .

Defendant argued that Counts 37 through 71 violate his Fifth Amendment privilege against self-incrimination on the following theory:

> In essence, the first set of counts charge alien smuggling, and the second set of counts purport to criminalize an alleged alien smuggler's failure to bring the aliens he has just smuggled immediately to an immigration officer and report their illegal presence in the country. This presentment requirement imposes an affirmative duty on an accused smuggler to come forward (immediately) and provide the government with evidence that will be used against him to prove the smuggling charges.

Def.'s Mot. ¶ 3. The Government filed a Response (dkt # 42), arguing that Defendant's Motion was premature and without merit. In his Reply (dkt # 49), Defendant conceded that the Motion presented only an "as applied" challenge to the constitutionality of § 1324(a)(2)(B)(iii) and, as such, must await the development of a factual record at trial. On October 14, 2008, Magistrate

2

Judge Simonton issued a Report and Recommendation (dkt # 56), recommending that "the motion[] be denied without prejudice to renew after the completion of the trial, or in the alternative, that the resolution of the motion[] be deferred until after the completion of the trial." A bench trial was held on October 23, 2008 (Minute Entry, dkt # 60), during which a Joint Bench Trial Stipulation (dkt # 59) was read into the record.

In summary, the facts from the Joint Bench Trial Stipulation are as follows. On August 13, 2008, Coast Guard officers heard a vessel run aground on Loggerhead Key, in the Dry Tortugas. The officers observed numerous people jump from the boat and run ashore. The boat then departed. When one of the officers ordered everyone to surrender, thirty-five people emerged from the bushes. It was determined that the people were Cuban nationals who had traveled from Cuba that day on board a go-fast boat matching the description of the boat that ran aground. A Coast Guard vessel soon located a boat about twelve nautical miles away that also matched the description of the boat that ran aground. Defendant and his co-defendant were on board. The men stated that they were fishing. The boat had significant hull damage consistent with running aground. A search of the satellite telephone on board revealed that on that day the boat had traveled from Pinar del Rio, Cuba, to the Dry Tortugas in the Florida Keys. The on-board GPS also revealed two way points in Cuba, dated August 12, 2008. Loggerhead Key is not a designated port of entry to the United States, and the Cuban nationals were not brought and presented to an immigration officer at a designated port of entry upon arrival. See Joint Bench Tr. Stip.; Def.'s Supp. 1-2 (dkt # 63).

Following the bench trial, the Court found Defendant Garcia-Cordero guilty on all counts (Minute Entry, dkt # 60). Defendant then filed a Supplement to his Motion (dkt # 63), and the

Government filed a Supplemental Response (dkt # 66). The Court now addresses Defendant's constitutional challenge.

**II.    DISCUSSION**

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." Hiibel v. Sixth Judicial Court of Nev., Himbold County, 542 U.S. 177, 189 (2004) (citing United States v. Hubbell, 530 U.S. 27, 34-38 (2000)). The Supreme Court, however, "has on several occasions recognized that the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws." Baltimore City Dept. of Soc. Servs. v. Bouknight, 493 U.S. 549, 556 (1990).

For the reasons that follow, this Court concludes that § 1324(a)(2)(B)(iii)'s bring and present requirement is part of a regulatory regime constructed to effect public purposes unrelated to the enforcement of criminal laws and that, as a result, Defendant Garcia-Cordero cannot invoke the Fifth Amendment privilege to resist prosecution for noncompliance. In reaching this conclusion, the Court assumes, without deciding, that the compelled conduct at issue would otherwise be sufficiently testimonial, incriminating, and compelled to qualify for the privilege.

A.

"[T]he fact that incriminating evidence may be the byproduct of obedience to a regulatory requirement, such as filing an income tax return, maintaining required records, or reporting an accident, does not clothe such required conduct with the testimonial privilege." Hubbell, 530 U.S. at 35 (footnotes omitted). In shaping this exception for certain regulatory regimes, the

4

Supreme Court has aimed to balance competing interests. "Tension between the State's demand for disclosures and the protection of the right against self-incrimination is likely to give rise to serious questions. Inevitably these must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other." California v. Byers, 402 U.S. 424, 427 (1971).

The development of the regulatory regime exception apparently begins with United States v. Sullivan, where the Supreme Court held that the privilege could not be invoked to avoid filing an incriminating income tax return. 274 U.S. 259, 263-64 (1927) ("It would be an extreme if not an extravagant application of the Fifth Amendment to say that it authorized a man to refuse to state the amount of his income because it had been made in crime.").

The Court has since articulated the outline of Sullivan's applicability in a series of cases. In Albertson v. Subversive Activities Control Board, 382 U.S. 70 (1965), Marchetti v. United States, 390 U.S. 39 (1968), and Haynes v. United States, 390 U.S. 85, 100 (1968), the Court distinguished Sullivan and held that the privilege against self-incrimination provided a valid defense for noncompliance. On the other hand, in Byers, 402 U.S. 424, and Bouknight, 493 U.S. 549, the Court concluded that the privilege yielded to the enforcement of valid regulatory regimes.

In Albertson, the Court ruled that registration requirements for Communist Party members violated the privilege. 382 U.S. at 79-81. Since admitting membership in the Communist Party could be used to prosecute the registrant under multiple criminal statutes, and registering "require[d] an admission of membership in the Communist Party," the Court held that the "obvious" risks of registration presented a "sufficient threat of prosecution to support a claim

5

of privilege." Id. at 77. The Court distinguished Sullivan by pointing out that "questions in the income tax return were neutral on their face and directed at the public at large, but here they are directed at a highly selective group inherently suspect of criminal activities." Id. at 79. Furthermore, the Court noted that "Petitioners' claims are not asserted in an essentially noncriminal and regulatory area of inquiry, but against an inquiry in an area permeated with criminal statutes, where response to any of the form's questions in context might involve the petitioners in the admission of a crucial element of a crime." Id.

In Marchetti, the Court addressed federal tax and registration requirements imposed on those engaged in wagering activities. 390 U.S. at 40. In light of the "comprehensive system of federal and state prohibitions against wagering activities," the Court concluded that compelling compliance with the tax and registration requirements violated the Fifth Amendment. Id. at 48. Furthermore, the defendant "was required, on pain of criminal sanction, to provide information which he might reasonably suppose would be available to prosecuting authorities, and which would surely provide a significant 'link in the chain' of evidence tending to establish guilt." Id. (footnotes omitted). The Court distinguished Sullivan by noting that unlike the tax return at issue there, "every portion of these requirements had the direct and unmistakable consequence of incriminating petitioner."[2] Id. at 48-49.

In Haynes, the Court held that the privilege against self-incrimination "provides a full

---

[2] The Court similarly concluded that the privilege was a defense for noncompliance with federal wager tax and registration requirements in Grosso v. United States, 390 U.S. 62 (1968). Also, in Leary v. United States, the Court held that privilege provided a defense to prosecution under a statute requiring persons who acquired marijuana to make disclosures and tax payments. 395 U.S. 6, 26-27 (1969) ("In short, we think the conclusion inescapable that the statute was aimed at bringing to light transgressions of the marijuana laws.").

6

defense to prosecutions either for failure to register a firearm . . . or for possession of an unregistered firearm." 390 U.S. at 100. Notably, the act at issue, while part of an "interrelated system for the taxation of . . . firearms," only applied to certain types of firearms. Id. at 87. This limitation was "apparently intended" to target "weapons used principally by persons engaged in unlawful activities." Id. at 87 & n.4. In addition, the act's registration requirement applied only to certain persons in possession of a qualifying firearm. That is, "one who made the firearm, or acquired it by transfer or importation, need not register if the [act's] provisions as to transfers, makings, and importations were complied with." Id. at 96 (internal quotation marks omitted). Given these restrictions, the Court concluded that the registration requirement was "directed principally at those persons who have obtained possession of a firearm without complying with the [act's] other requirements, and who therefore are immediately threatened by criminal prosecutions . . . . They are unmistakably persons 'inherently suspect of criminal activities.'" Id. (quoting Albertson, 382 U.S. at 70). Although registration would not always indicate a violation of the act, according to the Court, "the correlation between obligations to register [and] violations can only be regarded as exceedingly high, and a prospective registrant realistically can expect that registration will substantially increase the likelihood of his prosecution." Id. at 97.

Finally, the Court held that the firearm registration requirements were distinguishable from instances where information was "obtained in connection with regulatory programs of general application." Id. at 98. This was because -- in addition to being "directed at a highly selective group inherently suspect of criminal activities" -- the registration requirements did not concern "an essentially noncriminal and regulatory area of inquiry," but instead "an area permeated with criminal statutes." Id. at 98-99 (quoting Albertson, 382 U.S. at 79).

7

Furthermore, there was "no record or other documents . . . to which any 'public aspects' might reasonably be said to have attached." Id. (citing Shapiro v. United States, 335 U.S. 1, 34 (1948)).

In Byers, the Court declined to find that the privilege shielded a defendant from prosecution for violating a California statute that required motorists involved in accidents to stop and provide their name and address to the driver of the other vehicle. 402 U.S. at 432-34. By plurality decision, the Court distinguished Albertson, Marchetti, and Haynes, noting that they all involved disclosure requirements targeting a "highly selective group inherently suspect of criminal activities" and that "the privilege was applied only in an area permeated with criminal statutes -- not in an essentially noncriminal and regulatory area of inquiry." Id. at 430. By contrast, the California statute "was not intended to facilitate criminal convictions but to promote the satisfaction of civil liabilities." Id. It was directed to all persons who drive automobiles in California. Driving is a lawful activity, and even those drivers involved in an accident may not have committed any crime. Id. at 431. Furthermore, the fact that a driver's compulsory compliance with the motorist statute may lead to his arrest and charge did not necessitate application of the privilege. Id. at 434. Just as "the compelled disclosure of identity could have led to a charge that might not have been made had the driver fled the scene . . . a taxpayer can be charged on the basis of the contents of a tax return or failure to file an income tax form. There is no constitutional right to refuse to file an income tax return or to flee the scene of an accident in order to avoid the possibility of legal involvement." Id.

In Bouknight, the Court held that a mother could not invoke the privilege against self-incrimination to defy a juvenile court order requiring her to turn her child over to social services. 493 U.S. at 560-61. Although the mother claimed that the act of producing the child would

incriminate her, the Court determined that the requirement to produce the child was "part of a broadly directed, noncriminal regulatory regime governing children cared for pursuant to custodial orders." Id. at 560 ("This provision fairly may be said to be directed at . . . parents, guardians, and custodians who accept placement of juveniles in custody." (internal quotation marks omitted)).

B.

In balancing the State's demand for disclosures with the protection of the right against self-incrimination, this Court concludes that the regulatory regime exception applies in the instant case.

Section 1324(a)(2)(B)(iii)'s bring and present requirement is part of an extensive scheme of statutes and regulations through which the government exercises its control over the nation's borders. Furthermore, as the Government points out, the bring and present requirement applies more broadly than Defendant claims. See Gov.'s Supp. 6-8, 12-13. Notably, 8 U.S.C. § 1321(a) provides, in part:

> It shall be the duty of every person, including the owners, masters, officers, and agents of vessels, aircraft, transportation lines, or international bridges or toll roads . . . bringing an alien to, or providing a means for an alien to come to, the United States . . . to prevent the landing of such alien in the United States at a port of entry other than as designated by the Attorney General or at any time or place other than as designated by the immigration officers.

Thus, pursuant to § 1321(a), the duty to deliver passengers to a designated port of entry applies to all persons transporting aliens to the United States -- irrespective of whether those aliens have received prior authorization, and irrespective of the transporters' knowledge regarding such

authorization.[3] Accordingly, § 1324(a)(2)(B)(iii) does not impose any additional requirements applicable only to those who are already in violation of § 1324(a)(2). As noted by the Government, the bring and present requirement is "a routine procedure universally employed . . . [and which] does not, on its face, seek admissions or manifestly incriminating information, but merely presentation to an official charged with overseeing the entry of persons into the United States." Gov.'s Supp. 21. The statute therefore does not target a "highly selective group inherently suspect of criminal activities," Byers, 402 U.S. at 430 (internal quotation marks omitted), and the concerns addressed by the Supreme Court in Albertson, Marchetti, and Haynes -- all of which involved disclosure requirements imposed on "highly selective group[s] inherently suspect of criminal activities"-- are not present here.

Instead, the instant case is more analogous to Sullivan, Byers, and Bouknight, where the disclosure requirements were part of civil regulatory regimes, the requirements applied to broad groups, and the disclosed activity was not inherently illegal. Drawing from these cases, the Second Circuit concluded that, "[n]otwithstanding the protections of the Fifth Amendment, the government may require disclosure of information where the area of inquiry is regulatory rather

---

[3] Also, 8 C.F.R. § 235.1(a) provides that "[a]pplication to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection, or as otherwise designated in this section." In addition, 8 U.S.C. § 1221 requires that commercial vessel owners provide passenger manifests to immigration officials. It states, in part:
> For each commercial vessel or aircraft transporting any person to any seaport or airport of the United States from any place outside the United States, it shall be the duty of an appropriate official specified in subsection (d) of this section to provide to any United States border officer . . . at that port manifest information about each passenger, crew member, and other occupant transported on such vessel or aircraft prior to arrival at that port

8 U.S.C. § 1221.

10

than criminal, where the field subject to the disclosure obligation is not permeated with criminal statutes, and where there is a substantial non-prosecutorial interest served by the reporting regime." Rajah v. Mukasey, 544 F.3d 427, 442 (2d Cir. 2008); see also United States v. Mickens, 926 F.2d 1323, 1331 (2d Cir. 1991); United States v. Dichne, 612 F.2d 632, 639-41 (2d Cir. 1979). The Second Circuit further stated that immigration law is one such area where the government may require the disclosure of incriminating information:

> Immigration law is generally regulatory rather than criminal. Indeed, deportation hearings are civil proceedings. To be sure, there are some crimes related to immigration violations. But the level of criminal regulation in immigration matters is far less, and almost of a different order from that which governs those areas where reporting requirements have been struck down.

Rajah, 544 F.3d at 442 (citation omitted). This Court concurs with these conclusions.

Furthermore, the government has a particularly strong interest in securing the nation's borders. As a result, Fifth Amendment rights are generally diminished in the context of border crossings. See, e.g., United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001) ("Because of the overriding power and responsibility of the sovereign to police national borders, the fifth amendment guarantee against self-incrimination is not offended by routine questioning of those seeking entry to the United States." (internal quotation marks omitted)); see also United States v. Kiam, 432 F.3d 524, 530 (3d Cir. 2006) (holding that Miranda warnings are required during the immigration process only "[i]f the [border] inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution."); United States v. Gupta, 183 F.3d 615, 617 (7th Cir. 1999) ("A person seeking entry into the United States does not have a right to remain silent."). Thus, just as "a taxpayer's W-2 forms are required records not subject to the Fifth Amendment because they are a

11

mandatory part of a civil regulatory regime," Rajah, 544 F.3d at 442, "the Fifth Amendment does not protect [persons] either from being forced to turn over their passports and I-94s or to answer questions related to their immigration status." Id.

Addressing the Fifth Amendment's application to a border disclosure requirement, the Second Circuit, in Dichne, held that the privilege could not be used to resist compliance with a statute requiring declarations from "persons traveling across the border with more than $5,000 in monetary instruments." 612 F.2d at 639. In addition to noting that the disclosure requirement was not aimed at an inherently suspect group and did not involve an area permeated with criminal statutes, the Court concluded that the statute advanced the government's substantial non-prosecutorial interest in regulating the flow of currency across the nation's borders. Id. at 639-40. In this case, the Government's non-prosecutorial interest in regulating the flow of people across the nation's boarders is at least equally substantial. Furthermore, the fact that those transporting passengers to the United States might not seek entry into the country themselves does not diminish the public's interest in securing the nation's borders.

In sum, the privilege against self-incrimination does not protect Defendant from prosecution for failing to comply with the bring and present requirement, even though his compliance might have been incriminating.

### III.  CONCLUSION

For the reasons stated above, it is

ORDERED AND ADJUDGED that Defendant's Motion to Dismiss Counts 37-71 is DENIED.

12

DONE AND ORDERED in Chambers at Miami, Florida, this 15th day of January, 2009.

                                                                 K. MICHAEL MOORE
                                                             UNITED STATES DISTRICT JUDGE

cc:    All counsel of record